UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | |
|---|---|
| HAYNES MORRISON, | ) |
| Plaintiff, | ) ) ) |
| v. | ) )  No. 1:20-cv-02902-SEB-DML |
| CHILDREN'S BUREAU, INC., | ) ) ) |
| Defendant. | ) |

**ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

This cause is before the Court on Defendant's Motion for Summary Judgment [Dkt. 41], filed on January 31, 2022, pursuant to Federal Rule of Civil Procedure 56. Plaintiff Haynes Morrison brings this action against her former employer, Defendant Children's Bureau, Inc. ("CBI"), alleging that she was terminated based on her race (African-American) and subjected to retaliation based on her complaints of discrimination, all in violation of Title VII of the Civil Rights Act of 1964 ("Title VII") and 42 U.S.C. § 1981. CBI denies these allegations.

For the reasons detailed below, we GRANT Defendant's Motion for Summary Judgment.

**Factual Background**

Ms. Morrison earned her master's degree in Social Work in 2006. In March 2015, she began working for CBI, an organization that provides social services to children and families in Indiana. While she was employed, CBI operated two centers that provided these services—the Shelter Center and the Courage Center. Ms. Morrison was hired as

1

Director of the Shelter Center, which position she held until CBI terminated her, effective December 31, 2019. While employed in that role, Ms. Morrison was supervised by Abby Swift, Vice President of Residential Services. Ms. Swift, in turn, reported to Tina Cloer, CBI's President and CEO.

**Plaintiff's Job Performance**

Ms. Swift and Ms. Cloer described Ms. Morrison as a "good leader" with "lots of great experience" and considered her to be a "valued director" at CBI. Swift Dep. at 42; Cloer Dep. at 29. Ms. Swift testified that Ms. Morrison was well respected by her staff. Swift Dep. at 42. Ms. Cloer agreed that "most" of Ms. Morrison's staff "liked working for her." Cloer Dep. at 30.

**Plaintiff's Complaints of Discrimination**

In September 2019, CBI Vice President of Human Resources, Darlene Daniels, approached Ms. Morrison in her office and told her to "stop hiring people with funny names I can't say," apparently in reference to African-American applicants. Morrison Dep. at 24. Ms. Morrison testified that she reported this disparaging comment to her direct supervisor, Ms. Swift, who responded, "[y]ou know how Darlene is and it's not right but I will talk to her." *Id.* at 26. According to Ms. Morrison, Ms. Swift never followed up with her regarding her complaint. *Id.* Ms. Swift testified that she does not recall Ms. Morrison reporting Ms. Daniels's comments. Swift Dep. at 42.

Approximately two months later, on November 14, 2019, Ms. Cloer approached Ms. Morrison, stating that she had been told that Ms. Morrison wanted to address the conduct of a Caucasian male employee, Alex Devoe, who had repeatedly violated CBI

work policies yet was not disciplined in the same manner as African-American employees who had committed similar infractions. According to Ms. Morrison, Ms. Cloer stated that Mr. Devoe was "different" because his "father is one of [CBI's] employment lawyers so we can't hold him accountable" and "[h]e doesn't have chronic problems like the other problems." Morrison Dep. at 31, 32, 64. Ms. Cloer denies that this conversation occurred. Cloer Dep. at 31.

**Defendant's Licensing Requirement**

At some point near the end of 2018, CBI learned that an Indiana law governing licensing of social workers was going into effect on July 1, 2019. CBI consulted with an attorney regarding the implications of the Indiana statute and its impact on CBI personnel. Cloer Dep. at 46–47; Swift Dep. at 55. CBI began to notify employees as early as November 2018 that those who held degrees in social work would be required to obtain a state license "if they were in a role that required licensure." Cloer Dep. at 9. Ms. Cloer and Ms. Swift both testified that this meant that CBI employees with degrees in social work who served as directors, assistant directors, home-based therapists, outpatient therapists, and vice presidents were all required to have state licenses. *Id.* at 18; Swift Dep. at 24. CBI employees who had social work degrees but were in positions that did not involve practicing social work were not required to have a license. Cloer Dep. at 10.

CBI claims that Ms. Morrison was first told during her November 2018 performance review that she was expected to obtain a social work license through the state agency by June 30, 2019. Ms. Morrison, however, testified that, while her November 2018 performance review included a goal to obtain her license for "best

3

practices" purposes, she was told that she was not required to obtain a license as Director of Operations for the Shelter Program because she was not providing clinical services in that role. Morrison Dep. at 34–37. According to Ms. Morrison, although she was told that it was not a job requirement, she decided to set the professional goal of obtaining social work licensure by June 2019 even though she was not required to do so. *Id.* at 37.

On February 26, 2019, Ms. Morrison attended a meeting at which CBI management addressed the need for all CBI employees who met the licensure criteria to get licensed by June 30, 2019. The minutes from that meeting reflect that Ms. Cloer instructed attendees that, when hiring new staff, applicants with a bachelor's degree in social work were required to have an active license while those with a master's degree in social work were required, at a minimum, to be on "the path of obtaining their license." Dkt. 52-7. According to Ms. Morrison, after that meeting, Ms. Cloer approached her and stated that, because the Shelter Center program was non-clinical, Ms. Morrison was exempt from the licensing requirement, but that she had the option of obtaining her license for best practices. Morrison Dep. at 40.

**Plaintiff's Attempts to Obtain a License**

On June 14, 2019, Ms. Morrison secured a temporary social work license that was valid through June 14, 2020.[1] That same month (June 2019), she took the social workers' licensing exam for the first time but did not pass. She took the exam a second time in

---

[1] Ms. Cloer testified that CBI employees are permitted to practice social work, at least "for a time," under a temporary license while they are in the process of attaining a permanent license. Cloer Dep. at 44, 47. Ms. Cloer testified that she does not recall whether she knew at the time Ms. Morrison was terminated that she was working under a temporary license. *Id.* at 45.

September 2019, but again did not pass. According to Ms. Morrison, she planned to retake the licensing exam on December 21, 2019. In advance of the retake, Ms. Morrison registered for and attended an exam preparation course on November 15 and 16, 2019, which CBI paid for her to complete.

That same month (November 2019), Ms. Cloer and Ms. Swift met with an attorney to discuss the state licensure law and its impact on CBI employees. The meeting was not specifically about Ms. Morrison, but Ms. Cloer testified that, based on what was discussed with the lawyer, she left the meeting with the understanding that for Ms. Morrison to remain in her position as Director of Operations of the Shelter Center, she needed a social work license. Cloer Dep. at 47–48.

On November 21, 2019, Ms. Morrison met with Ms. Swift to discuss her annual performance review. At that meeting, Ms. Swift informed Ms. Morrison that Ms. Cloer had requested that Ms. Morrison's 2019 review be adjusted and downgraded to include concerns about licensure. Ms. Morrison was instructed at that time to continue to pursue her license. Ms. Morrison was given a deadline of December 31, 2019 to obtain a permanent social work license. Cloer Dep. at 17.

**Plaintiff's Termination**

On December 11, 2019, Ms. Morrison was issued a written warning regarding the licensure issue, which stated that "[i]f [Ms. Morrison] does not provide Children's Bureau with her license by December 31, 2019, her employment with Children's Bureau will be terminated." Dkt. 52-5. According to Ms. Morrison, rather than honoring the December 31, 2019 deadline referenced in the written warning, Ms. Swift, in conjunction with Ms.

Cloer and Ms. Daniels, instead terminated her the same day she was issued the written warning, although she continued to be paid through December 31, 2019. CBI, on the other hand, claims that although Ms. Morrison was warned of her impending termination on December 11, 2019, she was not officially terminated until December 31, 2019, after she failed to secure a permanent license as required. Ms. Morrison's termination notice is signed by Ms. Swift but is not dated. Although the termination notice is signed only by Ms. Swift, in response to Ms. Morrison's interrogatories, CBI indicated that the termination decision was made by Ms. Swift in conjunction with Ms. Cloer, and Ms. Daniels.

**Other Employees Required to Obtain Licenses**

According to CBI, Ms. Morrison was the only employee of the organization subject to the licensure requirement who was permitted to remain in her position without a permanent license after June 30, 2019. All other such employees were either suspended until they obtained licenses, accepted different positions that did not require a social work license, or resigned.[2]

Ms. Morrison claims, however, that she was not subject to the licensure requirement because she did not perform social work in her role as Director of the Shelter Center. CBI's current Director of the Courage Shelter, Lauren Smith, who is Caucasian, holds a bachelor's degree (it is not clear in which subject) but was not required to have a

---

[2] These CBI employees include: Amy Bennington (Caucasian), Katianne Haecker (Caucasian), and Melissa Reid (Caucasian), who were all suspended until they obtained licenses; Valerie Brown (race unknown), who resigned because she declined to obtain a license; and Dana Clegg (race unknown), who transferred to a different position that did not require licensure.

license because another licensed individual in the building supervised clinical staff. Ms. Morrison has testified that although the Shelter Center likewise had a clinically licensed individual on staff, she, unlike Ms. Smith, was terminated for failing to have a license.

**The Instant Litigation**

Ms. Morrison filed her complaint on November 5, 2020, alleging that she was terminated because of her race and that her termination was in retaliation for having previously complained of discrimination, all in violation of Title VII and § 1981. CBI denies these allegations and now seeks summary judgment in its favor on Ms. Morrison's claims.

## Legal Analysis

### I.  Summary Judgment Standard

Summary judgment is appropriate where there are no genuine disputes of material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). A court must grant a motion for summary judgment if it appears that no reasonable trier of fact could find in favor of the nonmovant on the basis of the designated admissible evidence. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986). We neither weigh the evidence nor evaluate the credibility of witnesses, *id.* at 255, but view the facts and the reasonable inferences flowing from them in the light most favorable to the nonmovant. *McConnell v. McKillip*, 573 F. Supp. 2d 1090, 1097 (S.D. Ind. 2008).

### II.  Discriminatory Termination Claim

Ms. Morrison first claims that she was terminated because of her race in violation of Title VII and § 1981. "The legal analysis for discrimination claims under Title VII and § 1981 is largely identical," except that race discrimination claims under § 1981 require showing that "race was a but-for cause of [the plaintiff's] injury," while race discrimination claims under Title VII "simply require that race be a 'motivating factor in the defendant's challenged employment decision.'" *Lewis v. Indiana Wesleyan Univ.*, 36 F.4th 755, 759 (7th Cir. 2022) (quoting *Comcast Corp. v. Nat'l Assoc. of Af. Am.-Owned Media*, 140 S. Ct. 1009, 1017 (2020)).

Although not required to do so, Ms. Morrison has chosen to proceed here under the familiar *McDonnell Douglas* framework to prove employment discrimination. Under *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), "the plaintiff has the initial burden of producing evidence showing that (1) she is a member of a protected class, (2) she was meeting the defendant's legitimate expectations, (3) she suffered an adverse employment action, and (4) similarly situated employees who were not members of her protected class were treated more favorably." *Simpson v. Franciscan Alliance, Inc.*, 827 F.3d 656, 661 (7th Cir. 2016). "If the plaintiff meets each element of her prima facie case, the burden shifts to the defendant to articulate a legitimate, nondiscriminatory reason" for the adverse action. *Skiba v. Ill. Cent. R.R. Co.*, 884 F.3d 708, 719 (7th Cir. 2018) (quotation omitted). If the defendant is able to do so, "the burden shifts back to the plaintiff to submit evidence that the employer's explanation is pretextual." *Id.* at 719–20.

Regardless of the method the plaintiff chooses to use to prove her case, however, "[t]he singular question that matters in a discrimination case [is]: '[W]hether the evidence

8

would permit a reasonable factfinder to conclude that the plaintiff's race, ethnicity, sex, religion, or other proscribed factor caused the discharge or other adverse employment action." *Tyburski v. City of Chicago*, 964 F.3d 590, 598 (7th Cir. 2020) (quoting *Johnson v. Advocate Health & Hosps. Corp.*, 892 F.3d 887, 894 (7th Cir. 2018)). In considering this question, "courts must assess the evidence 'as a whole, rather than asking whether any particular piece of evidence proves the case by itself,' regardless of whether the court also analyzes the evidence pursuant to *McDonnell Douglas*." *Tyburski*, 964 F.3d at 598 (quoting *Ortiz v. Werner Enterprises, Inc.*, 834 F.3d 760, 765 (7th Cir. 2016)).

Because Ms. Morrison has chosen to proceed using the *McDonnell Douglas* method, we follow her lead and assess the case first under that rubric. There is no dispute that Ms. Morrison is a member of a protected class and that she was terminated, therefore satisfying the first and third elements of her prima facie case of discrimination. The parties disagree, however, as to whether Ms. Morrison has established the second and fourth elements, to wit, that she was meeting CBI's legitimate job expectations and that similarly situated employees outside her protected class were treated more favorably. Even assuming that Ms. Morrison was meeting her employer's legitimate job expectations, she has failed to adduce evidence to show that any similarly situated employee outside her protected class was treated more favorably; accordingly, she has not put forth a *prima facie* case of discrimination under the *McDonnell Douglas* framework.

Ms. Morrison has identified Lauren Smith, the Director of CBI's Courage Center, as her only comparator. To be considered similarly situated, an employee need not be

9

"identical in every conceivable way" to the plaintiff, but the proposed comparator must at least be "'directly comparable' in all material respects." *Johnson*, 892 F.3d at 895 (citation omitted). While Ms. Morrison and Ms. Smith share certain characteristics, including both having been directors at CBI, Ms. Morrison has adduced no evidence establishing that Ms. Smith has an educational degree in social work. This is a critical fact as Ms. Cloer and Ms. Swift testified that CBI requires all its directors to be licensed *if they have a bachelor's or master's degree in social work*. It is undisputed that Ms. Morrison has a master's degree in social work, but there is no indication that Ms. Smith's bachelor's degree is likewise in social work. Without this information, we unable to find that Ms. Smith is "directly comparable" to Ms. Morrison in "all material respects." *Id.* Accordingly, Ms. Morrison has failed to identify a similarly situated comparator who was treated more favorably and therefore cannot establish a *prima facie* case of discrimination as is her burden under *McDonnell Douglas*.

Ms. Morrison's discrimination claim fares no better when assessing the evidence "as a whole." *Ortiz*, 834 F.3d at 765. Ms. Morrison contends that prior to November 2019, she was consistently told that she was not required to obtain a permanent social work license because she did not perform social work in her position as Director of the Shelter Center, which she contends demonstrates that CBI's proffered nondiscriminatory reason for her firing—that she failed to secure a permanent license by December 31, 2019—is pretextual. Even assuming that Ms. Morrison had been told up to November 2019 that she was not required to secure a license due to the nature of her work as the Director of the Shelter Center, she has presented no evidence to rebut Ms. Cloer's

10

testimony that, after Mr. Cloer met with an attorney in early November 2019 to discuss the licensing requirements, it was Ms. Cloer's understanding that individuals in Ms. Morrison's position who held social work degrees were required to be licensed. The remaining undisputed evidence is consistent with this testimony as the evidence establishes that the licensing issue was raised shortly after in Ms. Morrison's November 21, 2019 performance review when she was informed that she needed to procure her permanent license by the end of the year (December 31, 2019). Dkt. 52-5.

CBI reiterated the end-of-the-year licensure requirement in Ms. Morrison's December 11, 2019 written warning. Ms. Morrison contends that she was not simply warned of her impending termination at the December 11 disciplinary meeting as CBI claims but was instead told that she was fired on that date without being given an opportunity to meet the December 31, 2019 licensure deadline,[3] which she claims also evidences pretext. However, Ms. Morrison's December 11 written warning clearly provides that, *unless she provided CBI with her permanent license by December 31, 2019*, she would be terminated. *Id.* Ms. Morrison also concedes that she was paid through December 31, 2019, which is further evidence that she was not terminated until the end of the year, in accordance with the December 11 writeup. Although Ms.

---

[3] Ms. Morrison claims that CBI terminated her ahead of the December 31, 2019 deadline based on its mistaken belief that she had already taken the licensing test three times, which would have required her to petition for permission to take it again. In fact, Ms. Morrison had taken the test only twice at that point. However, "[p]retext requires more than showing that the decision was mistaken, ill considered or foolish …." *Formella v. Brennan*, 817 F.3d 503, 513 (7th Cir. 2016) (citation omitted). In any event, regardless of any misunderstanding, the evidence establishes that Ms. Morrison was not actually fired prior to the end-of-the-year deadline.

11

Morrison states that she was eligible and planned to take the licensing test on December 21, 2019, she has adduced no evidence showing that she in fact took the test on that date and/or otherwise procured her permanent license by the December 31, 2019 deadline.

Ms. Morrison points to the fact that she was working under a valid temporary license at the time of her firing as further evidence of pretext, given that Ms. Cloer testified that CBI employees were permitted to work under temporary licenses for limited periods of time while they were pursuing permanent licensure. However, the fact that CBI imposed on Ms. Morrison a deadline to secure her permanent license after she had already twice taken the licensure test rather than permit her to work under her temporary license indefinitely is not itself evidence of pretext, at least not without some evidence that other similarly situated employees outside her protected class were treated differently. Ms. Morrison has adduced no such evidence here. In fact, CBI has presented evidence to the contrary, to wit, that no other employee who was required to be licensed had been permitted to remain in their position for as long as Ms. Morrison without securing a permanent license. Without some evidence that CBI's explanation is not credible or is factually baseless, it is beyond our purview to question its business decision as "courts are not 'superpersonnel department[s]' charged with determining best business practices." *Stockwell v. City of Harvey*, 597 F.3d 895, 902 (7th Cir. 2010).

Finally, Ms. Morrison points us to Ms. Daniels's comment regarding not wanting to hire individuals whose names she could not pronounce and Ms. Cloer's explanation in response to Ms. Morrison's complaint that a white employee was "different" than African-American employees who engaged in similar misconduct because his father was

12

CBI's employment attorney as establishing that these decisionmakers harbored discriminatory animus. Ms. Morrison claims that a reasonable juror could find, based on these comments, that Ms. Daniels's and Ms. Cloer's employment decisions, including their decision to terminate her, were tainted by racial animus.

We acknowledge that "[a] remark or action by a decision-maker reflecting unlawful animus may be evidence of his or her attitudes more generally," *Joll v. Valparaiso Cmty. Schs.*, 953 F.3d 923, 934 (7th Cir. 2020), and that, in considering these comments, we "must be mindful of [our] duty to consider the evidence as a whole and construe it in the light most favorable to the non-moving party." *Collins v. Am. Federation of State, Cnty. & Municipal Employees Council 962*, No. 1:19-cv-4390-RLM-TAB, 2021 WL 3140763, at *4 (S.D. Ind. July 26, 2021) (citing *Joll*, 953 F.3d at 934). Even doing so here, however, these comments, made by two of the decisionmakers but not with reference to the adverse employment action at issue, are not enough to permit a reasonable juror to find that Ms. Morrison was terminated because of her race, given that she has failed to adduce any other evidence to call into question the nondiscriminatory reason proffered for her firing, to wit, that she failed to secure her permanent social work license. *See Huff v. UARCO, Inc.*, 122 F.3d 374, 385, 386 (7th Cir. 1997) (recognizing that, while "evidence of the decisionmaker's discriminatory motive regarding one employment decision may be used as evidence of that decisionmaker's discriminatory motive in making a similar employment decision," a decisionmaker's "remarks unrelated to the employment decision in question may not overcome summary judgment if they stand alone as evidence of the employer's discriminatory intent").

13

For these reasons, CBI is entitled to summary judgment on Ms. Morrison's discriminatory termination claim.

### III.     Retaliatory Termination Claim

Ms. Morrison also claims that she was terminated in retaliation for having made verbal complaints of discrimination to her supervisors.  To survive summary judgment on her retaliation claims under Title VII and § 1981, Ms. Morrison "must show evidence of '(1) a statutorily protected activity; (2) a materially adverse action taken by the employer; and (3) a causal connection between the two.'"  *Abebe v. Health and Hosp. Corp. of Marion Cnty.*, 35 F.4th 601, 607 (7th Cir. 2022) (quoting *Humphries v. CBOCS West, Inc.*, 474 F.3d 387, 404 (7th Cir. 2007), *aff'd*, 553 U.S. 442 (2008)).  To meet her burden on causation, Ms. Morrison must "offer evidence that a retaliatory motive was a 'but-for cause of the challenged employment action.'"  *Lesiv v. Ill. Central R.R. Co.*, 39 F.4th 903, 915 (7th Cir. 2022) (quoting *Gracia v. SigmaTron Int'l, Inc.*, 842 F.3d 1010, 1019 (7th Cir. 2016)).  "This requires proof that the unlawful retaliation would not have occurred in the absence of the alleged wrongful actions of the employer."  *Univ. of Texas Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 360 (2013).  Here, there is no dispute that Ms. Morrison was terminated, which constitutes a materially adverse employment action.  CBI maintains, however, that Ms. Morrison has failed to show either that she engaged in any statutorily protected activity or that any such activity was the cause of her termination.

Ms. Morrison argues that she engaged in statutorily protected activity on two occasions—first, when she complained to her supervisor, Ms. Swift, regarding racially insensitive comments made by Ms. Daniels, and second, when she complained to Ms.

14

Cloer regarding employees receiving unequal discipline based on their race. Defendants deny that Ms. Morrison made these complaints, and argue that, even if she had complained to her supervisors as she says, such activity does not constitute statutorily protected activity under the relevant statutes because she never filed a formal, written complaint of discrimination.

These rejoinders by Defendants are unavailing. Viewing the facts in the light most favorable to Ms. Morrison, as we are required to do on summary judgment, we must assume that she did in fact make verbal complaints of discrimination to her supervisors on the two occasions described above. With regard to Defendants' contention that such verbal complaints do not qualify as statutorily protected activity, the case law does not support their position as "even an informal or verbal complaint may qualify as protected activity," *Conner v. Bd. of Trustees for Univ. of Ill.*, No. 19 CV 846, 2019 WL 5179625, at *5 (N.D. Ill. Oct. 15, 2019) (citing *Davis v. Time Warner Cable of Se. Wis., L.P.*, 651 F.3d 664, 674 (7th Cir. 2011) (finding "informal complaints" to a supervisor to be "within the scope of protected activity")), so long as that complaint alleges that the discrimination occurred because of a protected characteristic, which Ms. Morrison's complaints allegedly did. Because determining whether Ms. Morrison engaged in statutorily protected activity requires credibility determinations that must be made by the factfinder, this issue cannot be resolved on summary judgment.

Turning to the causation element, Ms. Morrison can establish a causal connection between her statutorily protected activity and her termination with direct evidence of a retaliatory motive or "circumstantial evidence like suspicious timing, ambiguous

statements, treatment of similarly-situated employees, and any other relevant information that could permit an inference of retaliation." *Robertson v. Dep't of Health Servs.*, 949 F.3d 371, 379 (7th Cir. 2020). Regardless of which type of evidence is used, "[t]he 'dispositive question' is 'whether a reasonable [fact-finder] could find a but-for causal link between the protected activities and adverse actions at issue.'" *Id.* (quoting *Burton v. Bd. of Regents of Univ. of Wis. Sys.*, 851 F.3d 690, 697 (7th Cir. 2017)).

Ms. Morrison maintains that a reasonable jury could find a causal connection between her discrimination complaints and her termination based on the same evidence of pretext previously discussed in connection with her discriminatory termination claim. However, for the same reasons explicated above, such evidence, whether considered individually or as a whole, is not sufficient to support an inference that the proffered nonretaliatory reason for her termination, to wit, her failure to secure a permanent social work license by December 31, 2019, was pretextual. As that is the only evidence upon which Ms. Morrison relies to establish the causation element of her retaliatory termination claim, that claim cannot survive summary judgment.

## IV. Conclusion

For the reasons detailed above, Defendant's Motion for Summary Judgment [Dkt. 41] is <u>GRANTED</u>. Final judgment shall be entered accordingly.

IT IS SO ORDERED.

Date: _____9/22/2022_____                    _____
                                                SARAH EVANS BARKER, JUDGE
                                                United States District Court
                                                Southern District of Indiana

Distribution:

Vincent P. Antaki
REMINGER CO. LPA (Indianapolis)
vantaki@reminger.com

Amber K. Boyd
AMBER K. BOYD ATTORNEY AT LAW
amber@amberboydlaw.com